IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WISCONSIN CHEESE GROUP, INC,

OPINION and ORDER

                Plaintiff/Counter-Defendant,

No. 07-cv-219-bbc

      v.

V & V SUPREMO FOODS, INC.,

                Defendant/Counter-Plaintiff.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In this civil suit, plaintiff Wisconsin Cheese Group, Inc. challenges a decision of the United States Patent and Trademark Office's Trademark Trial and Appeal Board granting defendant V & V Supremo Foods, Inc.'s petition for cancellation of plaintiff's trademark registration.   Plaintiff relies on § 21 of the Lanham Act, 15 U.S.C. § 1071(b), which authorizes parties to seek a remedy by civil action when they are dissatisfied with a decision of the Trademark Trial and Appeal Board.

Defendant has filed counterclaims, alleging trademark infringement and unfair competition under §§ 32(1) and 43(a) of the Lanham Act and under Wisconsin common law.   Specifically, defendant contends that plaintiff violates defendant's "Del Caribe" trademark.

1

This case is before the court on plaintiff's motion for partial summary judgment. Plaintiff contends that defendant's counterclaims are barred under the equitable doctrines of laches, estoppel and acquiescence. (Neither party has moved for summary judgment on plaintiff's claims.)  I will grant plaintiff's motion for partial summary judgment because defendant's 14-year delay in bringing this action was unreasonable and unfairly prejudicial to plaintiff.  Thus, defendant's counterclaims for monetary and injunctive relief are barred under the doctrine of laches.  This conclusion makes it unnecessary to consider plaintiff's estoppel and acquiescence defenses.

Before turning to the undisputed facts, several matters require discussion.  A number of facts proposed by the parties are not included in the undisputed facts below.  In many instances, this is due to failure by one or both parties to follow this court's summary judgment procedures.  For example, in their responses to each other's proposed findings of fact, both parties offered new information not directly responsive to the proposed facts.  As the procedures provide, the court will disregard all such non-responsive assertions.  If a responding party believes that more facts are necessary to tell its story, it should include them in its own proposed facts.

I did not consider the proposed facts contained in plaintiff's Proposed Rebuttal Findings of Fact and Conclusions of Law.  The facts did not directly put into dispute any of defendant's proposed facts.  They were simply additional proposed facts, which this court's

2

procedures do not permit because the other party does not have an opportunity to respond to them.

Defendant disputed a number of plaintiff's proposed facts on the ground that it did not have adequate discovery. I have treated all of these facts as undisputed. The magistrate judge denied defendant's motion for additional time for discovery under Fed. R. Civ. P. 56(f). Defendant had an opportunity to appeal this decision, which it failed to do so. Any objections to the decision raised at this stage in the case are untimely and have been disregarded.

Finally, it has come to my attention that, plaintiff has filed a motion to compel evidence from defendant that may be relevant to plaintiff's laches defense. Whether the motion to compel will be moot in light of this summary judgment opinion is unclear. However, for the purposes of this opinion, I consider the record as it presently exists, disregarding any claims made in plaintiff's motion to compel.

From the facts proposed by the parties, I find the following to be material and undisputed.


UNDISPUTED FACTS

Both defendant defendant, an Illinois corporation, and plaintiff Wisconsin Cheese Group, Inc., a Wisconsin corporation, are in the business of selling cheese.

3

As early as December 31, 1976, defendant was using the mark "Del Caribe" on its cheese in the Illinois area.  In 1982, defendant registered the mark "Queso Blanco Supremo Del Caribe" with the state of Illinois.  The phrase "queso blanco supremo del caribe" translates in English to "superior white Caribbean cheese."

In February 1992, plaintiff began selling cheese in Illinois under the mark "Queso Caribe," which translates in English to "Carribean cheese."  On September 2, 1992, plaintiff filed an application for federal registration for the mark.  On December 14, 1992, the Patent and Trademark Office rejected the application, because it determined that the mark "Queso Caribe" was merely descriptive and therefore could not be registered.  Plaintiff did not challenge the rejection and its application was deemed abandoned as of August 27, 1993.

No later than 1993, defendant became aware of plaintiff's use of the "Queso Caribe" brand.  On March 8, 1993, defendant's attorney sent a cease and desist letter to plaintiff asserting that plaintiff's use of the mark "Queso Caribe" infringed defendant's mark, then described as "Queso Blanco Supremo Del Caribe."  The letter stated:

> Please be advised that we have been retained by V & V Food Products, Inc. to represent them in the protection of their various trademarks [sic] rights and interests.
>
> It has come to our client's attention that the Wisconsin Cheese Group, Inc. is manufacturing and/or distributing cheese under the name "Queso Caribe" in the Chicago and Northern Illinois areas.  Such distribution and use of the name "Queso Caribe" infringes upon trademark rights held by V & V Food Products, Inc.
>
> . . . V & V Food Products, Inc. has sold cheese under the trademark "Queso Blanco

4

Supremo Del Caribe" continually since 1976, in various states including Illinois.  In 1982, a Certificate of Registration was issued by the State of Illinois to V & V Food Products, Inc. for said trademark, a copy of which is enclosed.  In addition to this registration, by virtue of the continuous and extensive use of the trademark, and the public's association of "Queso Blanco Supremo Del Caribe" with products manufactured and distributed by V & V Food Products, Inc., our client has gained significant good will under the mark which is of great value.

Your distribution and use of the name "Queso Caribe" for cheese is likely to cause confusion, mistake or deception with regard to our client's use of the trademark "Queso Blanco Supremo Del Caribe."  Such activity on the part of Wisconsin Cheese Group, Inc. may constitute trademark infringement and unfair competition under common law, federal law, and various deceptive practices statutes in Illinois and other states where Wisconsin Cheese Group, Inc. distributes cheese labeled as "Queso Caribe."

Accordingly, on behalf of our client, we hereby demand that an authorized officer of your corporation sign, date, and return to the undersigned a copy of this letter to indicate that you will be promptly and permanently cease and desist all further use of the name "Queso Caribe" or any other confusingly similar name or mark.

It is our hope that bringing this matter to your attention will obviate the need for legal recourse.  If we do not hear from you by April 1, 1993, we may pursue available legal remedies.

Plaintiff refused to sign the cease and desist letter or take any further action demanded by defendant.  (The parties dispute whether plaintiff sent defendant a response, informing defendant that plaintiff did not believe it was infringing defendant's trademark.)

Between 1993 and 2000, defendant took no action against plaintiff.  During this time period, plaintiff developed a partnership with Costco and began selling its "Queso Caribe" cheese exclusively to Costco.  During the four years between 1996 and 2000, its sales to

5

Costco totaled more than $1,300,000.

Defendant was also developing its trademark during this time.  In 1995, defendant successfully filed an application for federal registration of the mark "Del Caribe."  In its application, defendant stated that the phrase "del caribe" means "of/from the carribbean [sic]."  In its application, defendant alleged that to the best of its knowledge no other person had the right to use the mark or one so similar as to cause confusion in the marketplace. Defendant did not allege or disclose in its application to the Patent and Trademark Office that any competitor was infringing on its "Del Caribe" mark and did not disclose plaintiff's use of "Queso Caribe."   On December 3, 1996, defendant obtained United States Trademark Registration No. 2,020,442 for "Del Caribe" in connection with cheese.

In March 2000, defendant sent a cease and desist letter to a company called CheesAmerica, Inc., stating:

> We represent V & V Supremo Foods, Inc., a Chicago based manufacturer and distributor of Mexican cheese products ("V&V").

> Please be advised that V&V has registered the trademark DEL CARIBE in connection with the sale of cheese under United States Trademark Registration number 2,020,442 dated December 3, 1996, a copy of which is attached.

> V&V has informed us that CheesAmerica is currently distributing cheese in the Illinois area under a label using the name CARIBE.  This name is confusingly similar to V&V's DEL CARIBE trademark and likely to induce confusion, mistake, or deception in those familiar with the V&V's [sic] trademark.  The use of this mark infringes on V&V's trademark rights and constitutes a violation of federal law.

6

On behalf of V&V, we hereby warn you that V&V intends to protect its trademark rights to the fullest extent under the law. V&V demands that CheesAmerica and its affiliates forever cease and desist throughout the United States from any and all uses of CARIBE or any other mark likely to be confused with V&V's DEL CARIBE trademark. Compliance with this demand requires pulling all offending products from store shelves.

Please return to the undersigned no later than April 14, 2000 one executed copy of this letter indicating the agreement of CheesAmerica, its successors, assigns, officers, directors, employees and agents, to comply with the terms of this letter. If Cheese America [sic] and its officers fail to comply with the terms of this letter, V&V may seek to further protect its rights by pursuing all available legal remedies including instituting litigation to seek compensatory and punitive damages, injunctive relief, attorneys fees and costs.

Sometime within the following week, plaintiff learned of the letter. Neither plaintiff nor CheesAmerica executed the letter. (The parties have not explained the nature of the relationship between plaintiff and CheesAmerica that led to plaintiff's receipt of the letter. The parties dispute whether plaintiff responded to the letter.)

In the 20 months following the letter to CheesAmerica, plaintiff sold in excess of $3,000,000 of "Queso Caribe" cheese, with no word from defendant. On December 13, 2001, plaintiff received another cease and desist letter from defendant's attorneys, stating:

We represent V&V Supremo Foods, Inc, a Chicago based manufacturer and distributor of Mexican cheese products ("V&V").

Please be advised that V&V's trademark registration of the trademark DEL CARIBE in connection with the sale of cheese under United States Trademark Registration Number 2,020,442 dated December 3, 1996 has reached the "incontestable" status.

Section 33(b) of the Lanham Act (15 U.S.C. Section 1115(b)) provides that federal

7

registration of incontestable marks are "conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's right to sue the registered mark in commerce." Accordingly, any argument, whether meritorious or not, that you or another party may have used the DEL CARIBE trademark or any confusingly similar mark prior to V&V's use [sic] no longer available to contest V&V's federal trademark rights. V&V has exclusive rights to use the DEL CARIBE trademark on or any confusingly similar mark on cheese in the United States.

V&V has informed us that Wisconsin Cheese Group is distributing cheese under a label using the CARIBE mark. This name is confusingly similar to V&V's well established DEL CARIBE trademark and likely to induce confusion, mistake, or deception in those familiar with V&V's trademark. As we have repeatedly informed you, use of this mark infringes upon V&V's trademark rights and constitutes a violation of federal law.

On behalf of V&V, we hereby warn you that V&V intends to protect its trademark to the fullest extent possible under the law. V&V demands that Wisconsin Cheese Group and its affiliates forever cease and desist throughout the United States from any and all uses of CARIBE or any other mark likely to be confused with V&V's DEL CARIBE trademark, in connection with cheese. Compliance with this demand requires destroying all infringing promotional materials and pulling all offending products from store shelves.

Please contact us directly or through your counsel, not later than December 24, 2001, to discuss how Wisconsin Cheese Group, Inc. intends to comply with the terms of this letter. If Wisconsin Cheese Group and its officers fail to comply with the terms of this letter, V&V may seek to further protect its rights by pursuing all available remedies.

Plaintiff did not agree to comply with the terms of this letter and made no response indicating that it would. Defendant did not initiate legal action as threatened, and plaintiff continued to use the "Queso Caribe" mark on its cheese.

On May 21, 2002, plaintiff filed a new trademark application for the "Queso Caribe"

8

mark, but abandoned the application ten months later.  On April 15, 2003, plaintiff filed an application for registration for the mark "Queseria Caribe."  Over the next year, it stopped using the "Queso Caribe" mark, and started using the "Queseria Caribe" mark exclusively.  On June 1, 2004, the application for registration of "Queseria Caribe" was published for opposition.  Defendant did not file a Notice of Opposition.

On August 24, 2004, the Patent and Trademark Office issued registration number 2,876,481 to plaintiff for the mark "Queseria Caribe" on cheese.  Upon learning of the registration, defendant instructed its attorneys to file a petition with the Trademark Trial and Appeal Board to cancel the registration.  Defendant initiated that action on February 22, 2005.  On February 15, 2007, the petition was granted.

Defendant sold $22,000,000 of its "Del Caribe" cheese to chain and independent retail grocery stores and restaurants between 1996 and 2007.  Plaintiff has enjoyed similar profits resulting from substantial growth.  Sales of "Queso Caribe" cheese have steadily increased from $71,000 in 1996 to $4,245,000 in 2006.  In the aggregate, from 1996 through 2007, plaintiff sold approximately $23,200,000 (9,700,000 pounds) of "Queso Caribe" and "Queseria Caribe" cheese.


OPINION

In  this  motion  for  summary  judgment,  plaintiff  contends  that  defendant's

9

counterclaims are barred under the equitable doctrines of laches, estoppel and acquiescence. Because I find that the doctrine of laches bars both monetary and injunctive relief, I will limit my discussion to this affirmative defense.

The doctrine of laches is derived from the maxim that those who sleep on their rights lose them. Chattanooga Manufacturing, Inc. v. Nike, Inc., 301 F.3d 789, 792 (7th Cir. 2002). For laches to apply in a trademark infringement case, the defendant must show that (1) the plaintiff had knowledge of the defendant's use of an allegedly infringing mark; (2) the plaintiff inexcusably delayed in taking action with respect to the defendant's use; and (3) the defendant would be prejudiced by allowing the plaintiff to assert its rights at this time. Id. at 792-93.

In lawsuits filed under the Lanham Act, the doctrine of laches plays a more important role than it otherwise might because the Act does not contain a statute of limitations on trademark infringement claims. Instead, the Court of Appeals for the Seventh Circuit looks to "analogous state statutes of limitations." Id. at 793. Once relevant state limitations period has run, an allegedly infringing party is entitled to a presumption that the doctrine of laches applies. Id. In this case, plaintiff identifies § 100.18(11)(b)(3) of the Wisconsin Deceptive Trade Practices Act as the analogous state statute, which defendant does not dispute. That statute imposes a three-year limitations period. Wis. Stat. § 100.18(11)(b)(3). To rebut the presumption, a party must offer evidence excusing its delay

10

or demonstrating that the party claiming laches has not suffered prejudice.  A.C. Aukerman
Co. v. Miller Formless Co., 693 F.2d 697, 699 (7th Cir. 1982).


A. Knowledge

It is undisputed that defendant had actual knowledge of the alleged infringement by
March 8, 1993, when it issued its first cease and desist letter.

Defendant points out unhelpfully that plaintiff changed its mark from "Queso Caribe"
to "Queseria Caribe" in 2003.   As defendant informed plaintiff in its December 13, 2001
letter, it is the word "Caribe," not the word "Queso" or "Queseria," that allegedly infringes
defendant's trademark:

> Defendant has the court that plaintiff is distributing cheese under a label using the
> CARIBE mark . . . . As we have repeatedly informed you, use of this mark infringes
> upon V&V's trademark rights and constitutes a violation of federal law.

Because the infringement claim against plaintiff turns on use of the word "Caribe," it is
defendant's knowledge of plaintiff's use of the "Caribe" mark in 1993 that is relevant for
determining proper application of the doctrine of laches.

Similarly, it does not matter that plaintiff may have used the "Caribe" mark "under
various business entities."   Those "business entities" are not parties to this lawsuit.  It is
sufficient that defendant was aware of plaintiff's allegedly infringing use of the "Caribe"
mark in 1993.

## B. Inexcusable Delay

Despite defendant's knowledge of the alleged infringement in 1993, it waited until 2007 to take legal action against plaintiff.  This 14-year delay was nearly five times longer than the three-year statute of limitations found in the Wisconsin Deceptive Trade Practices Act. Wis. Stat. § 100.18(11)(b)(3).  Thus, there is a presumption that defendant's delay was inexcusable.

To rebut this presumption, defendant says that its delay was excusable because (a) it had no knowledge that plaintiff was using the "Caribe" mark between 1993 and 2001, and (b) its actions were justified under the doctrine of progressive encroachment.  Both excuses fail as a matter of law.

First, lack of actual knowledge of infringement does not automatically excuse a trademark owner from unreasonable delay.  Because a trademark owner has an affirmative duty to police his trademark, he is charged with "such knowledge as he may have obtained upon inquiry, provided the facts already known to him were such as to put upon a man of ordinary intelligence the duty of inquiry."  Chattanooga, 301 F.3d at 793 (citing Johnston v. Standard Mining Co., 148 U.S. 360 (1983)).

In this case, the facts known to defendant in 1993 imposed upon it a duty to inquire further about ongoing trademark infringement by plaintiff.  Defendant knew that plaintiff had been using the "Caribe" mark.  Although defendant says  it assumed that plaintiff

12

stopped using the mark after defendant sent the first cease and desist letter in 1993, this was an unreasonable assumption. Even if I accept defendant's view that plaintiff never responded to defendant's 1993 letter, that does not tend to show that defendant's delay was reasonable. Defendant's letter did not say, "We will assume that you have stopped using our mark if we do not hear from you." Rather, defendant demanded that plaintiff respond to the letter to indicate its promise that it would stop using the "Caribe" mark. Further, defendant threatened to "pursue available legal remedies" if plaintiff failed to respond. Thus, defendant had no plausible basis for assuming that plaintiff's silence implied its acceptance of the cease and desist letter.

Moreover, even if I concluded that defendants stated ignorance of the alleged infringement between 1993 and 2001 were justifiable, I could not come to the same conclusion with respect to defendants claimed ignorance between 2001 and 2007. Defendant asserts that, after receiving no response to its December 13, 2001 letter, it assumed again that plaintiff had ceased its allegedly infringing activities. Even if it were reasonable to make this assumption for the first letter, defendant should have learned from its mistake after the second letter. Certainly by this time, any person of "ordinary intelligence" would have realized that plaintiff's silence meant defiance. Again, defendant had a duty to police its trademark, and instead it waited six years to take legal action against its competitor. This delay alone is twice the length of Wisconsin's statute of limitations, and

would independently give rise to a presumption of laches.  Defendant failed to rebut this presumption.

Defendant's  second argument fails as well.  The 14-year delay in taking legal action against plaintiff is not excused by the doctrine of progressive encroachment.  The Court of Appeals for the Seventh Circuit recently explained, "Under this doctrine, where a defendant begins use of a trademark or trade dress in the market, and then directs its marketing or manufacturing efforts such that it is placed more squarely in competition with the plaintiff, the plaintiff's delay is excused."  Chattanooga, 301 F.3d at 794.  In other words, the doctrine of progressive encroachment does not extend to all cases in which there has been a change in the alleged infringer's marketing or manufacturing, only to those in which the changes worsened the potential likelihood of confusion.

None of the changes to plaintiff's business between 1993 and 2007 implicate the doctrine of progressive encroachment.  First, defendant argues that plaintiff's increased sales between 1993 and 2001 constitute a "classic illustration" of progressive encroachment.  As a preliminary matter, even if I accepted this proposition, it would not excuse defendant's entire 14-year delay; it would merely shift forward eight years the point at which defendant had a duty to act, still leaving defendant with no excuse for the six-year delay between 2001 and 2007.  In any event, increased sales alone do not amount to progressive encroachment. Tillamook Country Smoker, Inc. v. Tillamook County Creamery Association, 465 F.3d

14

1102, 1110 (9th Cir. 1982) ("A junior user's growth of its existing business and concomitant increase in its use of the mark do not constitute progressive encroachment").  This limitation is consistent with the view of the Court of Appeals for the Seventh Circuit that a trademark owner who has full knowledge of infringement should not be permitted "to wait and see how successful his competitor will be and then destroy with the aid of court decree, much that the competitor has striven for and accomplished."  Hot Wax, 191 F.3d 813, 823 (7th Cir. 1999) (quoting Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 498 (2d Cir. 1961)).  As will be discussed below, an alleged infringer's investment in advertising and marketing is considered evidence of economic prejudice in favor of the alleged infringer.  Thus, it would be illogical to treat the increased sales resulting from such advertising as a limit on the laches defense.

Defendant's reliance on Chattanooga Manufacturing v. Nike, Inc., 301 F.3d at 794, is misplaced.  In Chattanooga, the court considered the doctrine of progressive encroachment, but it did not address the alleged infringer's increased or decreased sales or suggest that increased sales may constitute progressive encroachment.  Id.  Rather, the court focused exclusively on whether the defendant directed its marketing or manufacturing efforts to compete more directly with the plaintiff.  Id.  In fact, the court concluded that, absent specific evidence of such changes in marketing or manufacturing, the plaintiff's progressive encroachment argument amounted to "nothing more than a *post hoc* rationalization for [its]

15

unreasonable delay." Id.  Because defendant is guilty of a similar failure to present evidence of changes in its competitor's marketing or manufacturing practices, Chattanooga does not advance its position.

Defendant next asserts that progressive encroachment exists because plaintiff entered "trade areas" where defendant's mark was already established.  Specifically, defendant asserts that "[t]his is relevant in the present case where defendant's March 24, 2000 letter was addressed to an east coast company with apparently little market penetration in defendant's principal trading areas in the Midwest."  This argument ignores key facts.  Although defendant's March 24, 2000 letter was addressed to "an east coast company," the letter specifically recognized existing market penetration, alleging CheesAmerica's infringement "in the Illinois area."  More important, even though the March 24, 2000 letter did not address plaintiff's practices, defendant had acknowledged plaintiff's presence in Illinois *seven years earlier*, in its March 8, 1993 cease and desist letter.  Thus, defendant knew of plaintiff's presence in its "trade areas" for 14 years and took no legal action.  These facts cannot be construed as a response to progressive encroachment.

Third, defendant relies again on plaintiff's decision to change its mark from "Queso Caribe" to "Queseria Caribe."  This argument is a nonstarter because defendant does not argue that the change placed plaintiff more squarely in competition with defendant. Chattanooga, 301 F.3d at 794; see also Tillamook Country Smoker, 465 F.3d at 1110

16

(finding laches when junior user made changes to product label that did not put products more squarely in competition).

As a final note, defendant's unreasonable delay is not mitigated by the fact that it sent two cease and desist letters to plaintiff over 14 years.  (At defendant's urging, I do not consider its March 24, 2000 letter to be relevant, given that defendant was unaware that its letter to CheesAmerica would make its way to plaintiff.)  In Hot Wax, 191 F.3d at 823-24, the Court of Appeals for the Seventh Circuit found that five warning letters sent over the course of two years were insufficient to mitigate the unreasonableness of the plaintiff's 10- to 20-year delay in taking legal action against the defendant's alleged false advertising.  The court stated:

> Although we have recognized that attempts to resolve a dispute without resorting to a court do not constitute unreasonable delay for determining the applicability of laches, Hot Wax's sparse letter writing campaign can hardly be characterized as a serious attempt to resolve its concerns regarding Turtle Wax's products and advertising.

Id.

Likewise, defendant's two cease and desist letters to plaintiff over 14 years do not reflect a genuine attempt to settle the infringement dispute, especially given defendant's assertion that it did not receive a response to its cease and desist letters.  In the absence of a two-way conversation, it would be unreasonable to find that a fourteen-year delay was in any way productive.  A.C. Aukerman, 693 F.2d at 700 (". . . [T]he negotiations must

17

ordinarily be continuous and bilaterally progressing, with a fair chance of success, so as to justify significant delays.")

C. Prejudice

Turning to the final element of laches, a party asserting a laches defense must show that it has been prejudiced by the trademark owner's unreasonable delay in pursuing its cause of action.  Chattanooga, 301 F.3d at 792-93.  In defining prejudice in this context, the Court of Appeals for the Seventh Circuit has stated:

> A defendant has been prejudiced by a delay when the assertion of a claim available some time ago would be "inequitable" in light of the delay in bringing that claim and ensues when a defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed.  In this context, we have explained that laches is a question of degree.  To this end, if only a short period of time has elapsed since the accrual of the claim, the magnitude of prejudice required before the suit should be barred is great, whereas if the delay is lengthy, prejudice is more likely to have occurred and less proof of prejudice will be required.

Hot Wax, 191 F.3d at 824 (internal citations omitted).

Plaintiff has presented clear evidence of economic prejudice sufficient to succeed on a laches defense.  Economic prejudice exists when a trademark owner's delay caused the alleged infringer to build up a valuable business around its trademark in a way that would not have happened if the trademark owner had asserted its rights promptly.  Chattanooga, 301 F.3d 795.  In this case, plaintiff relied on defendant's delay when it decided to invest millions

18

of dollars in promoting its cheese under the "Caribe" mark.  During the 14-year delay, plaintiff developed an exclusive partnership with a major national retailer and increased its sales of "Caribe" cheese exponentially.

Had defendant taken legal action against plaintiff within a reasonable time after learning of the alleged infringement, plaintiff "certainly could have invested its time and money in other areas or simply renamed its products." Hot Wax, 191 F.3d at 824.  Plaintiff's investment of resources, coupled with increased sales, properly constitutes economic prejudice as a matter of law.  Id. (upholding finding of prejudice as matter of law when defendant invested significant time and money in advertising and product development during a 10- to 20-year delay); Chattanooga, 301 F.3d at 795 (finding "more severe" prejudice when alleged infringer spent millions of dollars promoting products and acquiring position as market leader during 15-year delay); ABB Robotics, Inc. v. GMFanuc Robotics Corp., 52 F.3d 1062, 1065 (Fed. Cir. 1995) (finding that "increasing sales" may alone constitute economic prejudice). Because these facts are sufficient to show prejudice, I need not consider plaintiff's assertions of "evidentiary"  prejudice.

Even without a strong showing of economic prejudice, plaintiff would prevail on this element.  As discussed above, because defendant's delay was longer than the limitations period under state law, prejudice to plaintiff is presumed.  Chattanooga, 301 F.3d at 793.

19

Defendant has failed to overcome this presumption. Instead, it argues only that any prejudice that occurred was not the result of plaintiff's reliance on defendant's delay, but rather reliance on its attorney's opinion regarding non-infringement.

I agree with defendant that actual reliance is an implicit requirement in a laches defense. Blue Cross and Blue Shield Association v. American Express Co., 467 F.3d 634, 640 (7th Cir. 2006) ("[To prove laches], there must also be prejudice - - - reliance, to one's detriment, on a belief that delay signaled approval of the acts in question.") But plaintiff relied reasonably on defendant's inaction when it decided to expand its business. A.C. Aukerman, 693 F.2d at 702 ("[N]otice from a [plaintiff] to the defendant that infringement has occurred, accompanied by a threat of enforcement, and followed by an extended period of nonenforcement, is affirmative conduct from which an alleged infringer could reasonably infer that the claim against it had been abandoned.").

It is irrelevant that plaintiff decided to continue using the "Caribe" mark in part because of the advice of counsel. The Court of Appeals for the Seventh Circuit has held expressly that, when there is a legal presumption of laches, the presumption is not defeated merely because the alleged infringer relied in part on its attorney's opinion regarding liability. Continental Coatings Corp. v. Metco, Inc., 464 F.2d 1375, 1378 (7th Cir. 1972) ("It is no doubt true that Metco's decision . . . to risk litigation rather than to discontinue production

20

was predicated on its opinion that the patent was invalid; but the growth in Metco's business in the ensuing several years was permitted to continue without challenge . . . . [T]he presumption of damage is applicable.")

## D. Injunctive Relief

The only question remaining is the proper scope of the defense.  The doctrine of laches bars a plaintiff from recovering damages or wrongfully derived profits during the time prior to filing a suit, Hot Wax, 191 F.3d at 824, n. 3., but it is not an automatic bar to injunctive relief in trademark actions.  Seven-Up Co. v. O-So-Grape, Co., 283 F.2d 103, 106 (7th Cir. 1960).  In some cases, however, "the delay may be so prolonged and inexcusable that it would be inequitable to permit the plaintiff to seek injunctive relief as to future activities."  Id.  For example, in a false advertising claim under the Lanham Act, the court of appeals held that a bar on injunctive relief was appropriate when the plaintiff delayed 10 to 20 years in taking legal action, and when the defendant invested significant time and money into its business as a result.  Hot Wax, 191 F.3d at 824, n.3.

I conclude that, under this standard, it would be inequitable to permit defendant to seek injunctive relief against plaintiff on its infringement counterclaims.  This is not a typical case of laches; plaintiff has shown extreme delay and substantial prejudice.  Defendant waited

14 years to pursue its legal claims, while plaintiff invested millions in its mark and developed an important relationship with a national retailer.  Defendant offers no excuse for this delay, other than the assertion that it should not be responsible for failing to police its trademark. As the maxim goes, defendant slept on its rights and lost them.  It would inequitable to force plaintiff to abandon its "Caribe" mark now, facing loss of its major investments and essentially taking the fall for defendant's failure to satisfy its legal duties as a trademark owner.

ORDER

IT IS ORDERED that plaintiff Wisconsin Cheese Group, Inc.'s motion for partial summary judgement is GRANTED and defendant V & V Supremo Foods, Inc.'s counterclaims are DISMISSED.

Entered this 12th day of March, 2008.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

22

23